Wait a minute until people get settled. Morning. I'd like to reserve four minutes for rebuttal if I may. There are three issues that we've raised on appeal in this case and I would like to focus my argument this morning on the two most important which have to do with the district courts calculation and standards used with respect to calculating the loss amount at issue in this case and its decisions with respect to restitution. As the court is aware, the district court in this case decided to ultimately use intended loss as the measure of loss. We do not dispute that the district court was free to do that at all. The problem here and what I want to clarify from the outset is that all of the factual findings that were contained within the district court's opinion were based on conduct that Mr. Healy engaged in and representations that he made to other businesses, to potential clients. There's a huge difference under the law between misrepresenting your company's capabilities and yourself in a sense to obtain money to invest in securities versus lies that are told and puffing that goes on between two businesses. And all of the testimony from Jason Farr specifically and I'm referring to page ID numbers 438-445 have to do with Mr. Healy's representations to other businesses. What the company could do, what it would do for whatever essentially company that Mr. Healy was talking to, it seems to change all the time. I'm also not going to stand up here and defend my client's misrepresentations in this case. I find them just as vile as I'm sure the court does. He started the company, did he not? He started DSS. He did and that's another point that I want to bring up is that he founded the company but Chris Watson was in on this company also from the beginning and he was also an initial target of the investigation. Now as the court is aware, the district court ultimately found Mr. Healy responsible for $1.4 million. It was all of the investor money essentially. I have a nephew, Chris Watson and he's not the target. Thanks for the clarification. How do we know? He's too young. Go ahead. But Mr. Watson received $260,448 as salary and cash withdrawals for which Mr. Healy was found criminally responsible and sentenced for. Healy received $201,592 in salary and benefits. This also goes to kind of the standard of review here too because we're asking for the amount of money that was ever valued as part of the calculation of loss in this case. Never, no. And under note 3C, Roman numeral 5 I believe it is, of the commentary to section 2B1.1 of the guidelines, it specifically says that in a context like this, in a business context like this, the court is to consider the amount of loss in the value of the securities, the equity. That was never done at all in this case. The trial court was not proceeding under a forfeiture, correct? No. No judgment lien had been issued against Mr. Healy, correct? No, Your Honor. Let's explore that for just a second. He raised this $1.4 million. The claim is that that $918,000 should be offset by a number of different things, one of which that you were just alluding to was the value of this DSS company, correct? Well, I think the court is referring to restitution here. I'm talking about the loss amount that he was ultimately, and yes, we do claim that that's in the restitution argument, but in terms of... You haven't gotten to that yet. I haven't, no. Okay, I'll speak to that question. In terms of the actual loss amount, and I want to give the court some specifics here because I think... The reason I'm asking is Judge Watson asked you about a valuation. I don't think the valuation doesn't go to the loss calculation. It goes to restitution, right? Correct. So that's why I was asking you about restitution. Well, it goes to both actually, essentially. Oh, you don't get to categorize exactly what we're talking about at any given time. My apologies. I think it goes to both, though, Judge, because if you look at the notes to when you're calculating intended loss, there are five factors that a district court is supposed to consider, and it can consider the totality of the circumstances and all of the information available, but the primary one that applies here is the loss and value to the assets, to the equity and to the securities. That was never done here. Now, I'd like to give the court some... I'll ask the question I was going to ask anyway then, whether it goes to restitution or loss calculation. As I understood the record, and please correct me if this is wrong, the trial counsel, the sentencing counsel, which was not you, right? Correct. If I remember right, said on the record at the sentencing that the company had or probably had no value at the time of the surrender of the stock. I don't believe that we ever stated that. I think your client's counsel did, but let me pass that for just a second. Okay. I'll go back and find that. The reason that that concession was made, if it was, as I understand it, trial counsel was not arguing whether the company did or did not have any value at the time of the surrender. Trial counsel was arguing that the measurement should be, rather than at the time of disgorgement, the measurement should be at some future time. The district judge said, no, we're not going to do that because any value in which the company goes up will be due to the efforts of the current management and not Mr. Healy. Right, and this actually... Do I misunderstand that? No, and this actually has to do also with the company's representations at that hearing, and I'll skip to that part, too, since you're asking about it. October 23rd, 2012 hearing. Correct. May speak to Judge McKeeks. Correct. The counsel for DSS essentially, and I realize that I shouldn't use the word misrepresented, but instilled in the district court this strong sense of urgency that the company needed to be, or excuse me, I believe this was at the August hearing, that the company needed to be completely disassociated with Healy post-haste. The company did not want to wait for Mr. Watson to become available to testify, really pushed the district court on this issue, claiming that any association with Healy was tainting the company and tainting its ability to raise additional capital. But a month after Mr. Healy pled guilty in this case, the company entered into a consulting agreement with him, which is document 34, I believe it exhibits C, D, and E, where they agreed to tie themselves to Mr. Healy for another year after he had already pled guilty to defrauding them. So, you know, counsel's representations at that hearing make absolutely no sense, and that's why, as we pointed out in the briefs, what happened here is the court held the hearing in July, stated on the record in front of other victims that there was a possibility that they could retain their equity and claim restitution, and so all of a sudden the company's tone and its arguments to the court completely changed. Prior to this point, they had been strongly arguing that the company had value, it had value, that they repeatedly asked the government not to take any action that would devalue the company. So how do we deal with that change in your client's counsel's position? Because there appears to be a change in position from the August hearing to the October hearing. In sentencing, or I'm sorry, in trial counsel's position? Yes. I don't, I think Mr. Wolhander's concession there was more to appease the court at that time in hearings on this, and the court had already... The specific quote from your client's counsel at the time on this October 23rd hearing was, quote, it probably may never have value, end quote. Oh, oh, okay, I understand. Now whether that's intended to appease, whatever that means, a judge or not, it is, it is what it is, so how can there be error if the correct measurement is the value at the time of If the correct timing is the value at the time of disgorgement, if the lawyer at the hearing tells the judge it probably has no value, then where is the error? Well, what he was speaking to was a future potential ability to claim an offset. Where's the court's authority for ordering disgorgement as a form of restitution? I believe 366A, Mandatory Victims Restitution Act, allows for that. I don't have the statute in front of me. I haven't looked at it for a while, but I know for certain that... ...for the return of property, if you can return it, he didn't steal any of his own property, correct? Correct. It was his property. Correct. Would you agree with me? I would. And otherwise, return the value thereof in money, correct? Correct. It doesn't say disgorge shares in a company that you own. Absolutely. But yet your counsel agreed to that below. I don't know, honestly. Okay. Well, you've chosen, correctly or incorrectly, to argue, rather than contesting whether disgorgement was proper, your argument goes to the value of the shares. Correct, Your Honor. And not only that, but what we're essentially saying with respect to the statute... Because you actually like the disgorgement. You like it because he gets rid of this worthless stock and you want to get credit for it. No, absolutely. Actually, what we would prefer here was that he pay the restitution and get his stock back. Because, as I was going to mention earlier, the company is doing just fine. The company continued on after this vitalifeid.com and the dsscard.com. And it's worth zillions of dollars today. Not zillions. I don't know exactly, but the point is that they are still selling these cards. All of the technology works. All of the district court's findings here that the company didn't exist, that it had these capabilities that it didn't have, it actually did. And it's doing just fine. And so, with respect to the court's findings that... But as opposed to your argument that the burden was upon the government to prove that it had no value, that's one of your arguments. If this client's counsel did concede that it had no value, it would have been his burden to refute the position that it had no value to come in with evidence of value, right? Well, we never got that opportunity, though, Judge, because all of the hearings in this case had to do with... Deprived of the opportunity? No, what happened in this case was all of the testimony at the July hearing had to do with calculating the loss amount. There was never any evidence or testimony on value. There were promises that were made in the future that the court and counsel for the government... That's really not my question. Did your counsel, did your client's counsel seek to either take a position or support the position with evidence and was somehow deprived of that opportunity? Well, based on the record, it looked like that was the intention, and I'm not sure how it happened. I'm not sure if the court basically forgot that that was going to happen in the future. We don't have any idea what the conversation was between hearings, between all of the participants in this matter. So they reconvene, and did the attorney at the time seek to do anything that he was prohibited from doing? Not on the record, no. All right. You'll have your rebuttal. Good morning, Your Honors. May it please the Court. Sonya Ralston for the United States. I'd like to start by pointing the Court to the point in the August transcript. It's page 20 of that transcript, or ID 244, which is the point at which Mr. Healy's counsel concedes that the stock has no value. It's in discussion of whether Mr. Healy has the ability to pay a fine. It is nonetheless a concession, and that's, I think, fair for the District Court to rely on. As to the calculation of the loss amount, the counsel now has conceded that the question here is a factual dispute, that we're not talking about a legal dispute, we're talking about a factual dispute, and that means the standard of review is clear error. Unless the District Court's factual finding is clearly erroneous, this Court must affirm. Now, the District Court, in its written opinion, considering whether the intended amount of loss was reasonably calculable, goes back and forth between whether this is a pump-and-dump kind of scheme or whether this is a sham company kind of scheme. The Court acknowledges that there's evidence pointing in both directions and ultimately comes down on the side of it being a sham company, that Mr. Healy never intended to do anything worthwhile with the company, that his intent was to use a bet of lies to raise a lot of money and live a lavish lifestyle. He was a bad actor. We get that. It's your burden to prove the amount of the loss, correct? The burden is on the government to present sufficient evidence from which the District Court can conclude by a preponderance of the evidence a reasonable estimate of the amount of intended loss. Right. And you did that, you think? Yes. The government has. And yet, at some point in the colloquy back and forth with the government or with the Court, there's an admission by the U.S. Attorney that it's impossible to value DSS, and if you don't value DSS, then it's impossible to come up with a proof of loss or a total loss figure, is it not? In the government's sentencing memorandum, it concedes that actual loss cannot be accurately determined and argues for gain. The government makes no address of intended loss. In its written opinion, the District Court addresses this. It agrees that actual loss cannot be calculated, but it says that the parties neglected to address intended loss, which the guidelines say must be used if it can be reasonably calculated instead of gain. And then the Court goes on to say that in presenting its evidence of Mr. Healy's gain from this scheme, the government presented sufficient evidence from which the District Court concluded that the intended loss was reasonably ascertainable, which is the standard under the guidelines. The Court determined that Healy's intent never changed. The fact that he was, his scheme was uncovered and he was removed from the company. And that Exhibit 34, Docket Entry 34, Exhibit C, which is DSS's sentencing memorandum, has a March 21, 2012 agreement signed by Mr. Healy withdrawing from the company, giving up all of his shares. One paragraph of that is a consulting agreement, but it talks about an ongoing deal in Ghana, which at that point the company didn't know was a complete fraud that comes out later. And so, you know, it's if the deal in Ghana is closed within 45 days, he'll receive a certain payout that of course never happens. But he had withdrawn from the company. So they kept him on to try to close a deal in another country that they didn't know was a fraud from the inception. That's my understanding. This whole argument about the loss calculation and the intended loss deals with this question about how large an enhancement he gets. He got a 16-level enhancement for this $1.4 million. I forgot, what is the range? In other words, what would Ms. McPherson have to succeed in getting this down to in order to change that level 16 enhancement? They argued for a loss of less than $400,000, which would take it down four levels. There's an intervening level between $400,000 and a million, which is a 14-level enhancement, which is what the government had advocated. So even if we subtract this other guy's salary, as she argued, from the $1.4 million, it still keeps you in the 16-level range? Yes. Because that's a million to what? I think $2.5. Okay. Thank you. Under what authority did the court order divestiture of his shares? The court's order entered after the— Court for disgorgement. The court frames it as a partial restitution order. It's unclear how much effort this actually enacts, given that he had voluntarily signed an agreement giving up those shares six months earlier, but— That's the plea agreement? No, that's a withdrawal agreement. It's the Exhibit C to Docket Entry 34. Okay. But in any event, the court frames it as partial restitution in making the company whole that one of the things that Mr. Healy did in the course of this fraud was to essentially run this company into the ground and that, therefore, they had a loss. And this was the restitution the company had asked for. The court and the government throughout the record seem to agree that Mr. Healy obtained his shares in DSS through fraud. What evidence of that was there in the record? Clearly, there's plenty of evidence that he committed fraud, but obtained his shares in a company he owned through fraud? So, that's a tricky question, and there is a footnote in the district court's loss calculation opinion that says that. I don't think you have to take it on exactly those terms, though, that the entire company was a fraud is the district court's factual finding. Look, I'm a district judge. I'm big on showing deference to the district court, but that's not the point of today's hearing. I understand. So, the district court makes this factual finding that it's a sham company, that all the money has been raised just for his personal piggy bank, and that, therefore, his ownership in that company, essentially his association with the other investors, is come by fraud. So, I think that's what the court means when it says that his ownership was acquired by fraud. It's that any value that the company had was acquired by fraud, and, therefore, his ownership to the extent that it was anything more than a piece of paper was acquired by fraud. I think you're correct that his ownership in the piece of paper was not acquired by fraud because he incorporated it before the fraud started. But the only arguable asset of this company was the patent, which, by the way, has been denied by the Patent and Trademark Office. And that asset wasn't even acquired until May 2010, which is more than 15 months after he's been raising all this money. It's actually near the end of the time when he's raising the money. So, to the extent the company was anything more than a piece of paper for that first period of time, it was just the investor's money. That was the only thing that was the company, and all of that was acquired by fraud. Well, clearly, the court has to value the company on the day of sentencing. That's when they're presented with it. They can't think about what's going to happen in the future. Obviously, he's entitled to offset in the future if he has paid down some of that money. I get that. Is there a danger of double or triple recovery for any of the folks on this list that was submitted? No. They get their shares back. They get Healey's shares. They get all the money back that they lost. So, I'd like to separate two things for a moment. One is the loss calculation, and the other is the restitution. For the loss calculation, there's no requirement that the court come up with a value for the company because the court was looking at intended loss, which has nothing to do with what happens in reality. The second is the restitution. And under the statute, it's the value at the date that the property is returned, which in this case we're assuming was at the sentencing hearing where it was ordered returned. And so what happens after that point is completely irrelevant. The company goes on to make millions. He never gets an offset. That doesn't matter under the statute. But the question about multiple recovery, no, because at the point at which the restitution is calculated, the statute instructs to determine the loss, and they're claiming the loss is the investment that they gave up, the money that they paid in, and that that amount determined on the date of the sentencing offset by the value of the company, which the court said is nothing, and that's the restitution award. The only thing that that could be offset by is if, you know, under 3664, if they get a civil recovery for compensatory damages, but that's not at issue here. So that's the answer to your question. Thank you. If there's nothing further, thank you. We ask the court be affirmed. Just a couple things with respect to the loss amount, because this is extremely important in this case. The specifics are, it's not just Chris Watson's salary. We're also talking about almost $60,000 paid to another employee's salary, $26,000 in employee medical expenses, $132,000 in web hosting, computer and technological infrastructure investments, and fees that were paid by Healy to other companies. $78,000 went to the Smiths on the underlying note for the technology for the business. $12,000 in shipping. Let me say that a fraudster is going to be sending out, what's the subject of the day in USA Today is supplements. Somebody is going to, a fraudster is going to be sending out worthless supplements. So to be able to do that, you have to get the supplements, you have to get the jars and the stuff to put in them, and you have to have a warehouse and you have to have an infrastructure to be able to do that. So why would a fraudster ever be able, in my analogy, as imperfect as it might be, to then say, well, gee, it was a legitimate expense to go rent the warehouse. I get credit for that against my fraud. It's all something that's necessary in order to accomplish the fraud. Because at the end of the day, there's no legitimate company behind that fraud. Here you have actual employees. You have actual technological expenses. There were $136,000 in miscellaneous charges that we don't even know what they went for because the bank lost the documents documenting the underlying transaction. You've got $19,000. One of the biggest fraud cases that came out of, I think it was the Southern District of Ohio, was a case where there were hundreds of millions of dollars of a supplement that was sold. And that company had hundreds of employees. So because you have to hire people to either create the facade or to actually accomplish the fraud, therefore you get credit for that? I don't understand that. But I doubt very much that that company is still in existence and is still thriving and that its shareholders essentially begged the court to keep their stock. Here you have a company that is still in existence, and he added value. You certainly can't argue that he intended for Chris Watson to lose $268,000 in salary. Chris Watson got that money. Wait a minute. I don't understand that argument. How did Watson lose the salary because your guy doesn't get credit for it? Exactly. He didn't. He didn't. But the thing here is the court used intended loss as the amount of loss for purposes of calculating the guidelines range. It included... From the investors. No. Well, yes, intended loss as a whole. It took all $1.4 million, all of the money that all of the investors had ever put into this company, a huge portion of which went to pay Chris Watson's salary, the salaries of other employees, employee medical expenses. Why does that matter in terms of the intended loss vis-a-vis the investors? Because for one, Chris Watson was an employee and an investor. He was also another member of the corporation. But when he... What effort was made by Mr. Healy to demonstrate credit or offset? Well, he argued it to the district court in a sentencing memorandum. During cross-examination, he brought out the fact on cross that all of the business expenses that the government initially conceded were legitimate business expenses. There were over $700,000 there that the government said, the majority of the $1.4 million went to pay salary and benefits, therefore we are not going to go after that. We concede that you can't include that in your intended loss calculation court. We're going to ask you to hold him responsible for $524,000. Yet the district court at sentencing went completely beyond that, went to the full $1.4 million and offered no real explanation for doing that other than all of its findings with respect to Healy's misrepresentations. And I see my time is up. I just wanted to finish that thought. And all of those misrepresentations had to do with those that were made to other companies, not to investors. Thank you. All right, thank you. The court notes that you have been appointed under the Civil Justice Act. We appreciate your assistance both to Mr. Healy and to the court. It makes our job easier and provides valuable representation in this case for the defendant. So thank you for your service.